UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **UMEKI HARDING** | **CIVIL ACTION 12-cv-1562** |
| **VERSUS** | **JUDGE DOHERTY** |
| **MIDSOUTH BANK N A** | **MAGISTRATE JUDGE HANNA** |

**MEMORANDUM RULING**

The defendant's Motion to Compel Arbitration and Stay Proceedings[Rec. Doc. 4] has been referred to the undersigned for disposition.[1] After considering the memoranda of the parties and the oral arguments presented on September 25, 2012, the court finds that the motions should be GRANTED.

*Facts, Procedural History, and Positions of the Parties:*

On December 9, 2004, Plaintiff Umeki Harding opened a checking account at Midsouth Bank.[2] At that time, she signed an Account Agreement, which provided in pertinent part that she "personally and as, or on behalf of, the account owner(s) agree to the terms of, and acknowledge receipt of copy(ies) of, this document and the following: Terms and Conditions, Electronic Fund Transfers, Substitute Checks, Privacy, Truth in Savings, Funds Availability." [Rec. Doc. 4, Ex. A-1] Ms. Harding proceeded to use her checking account and/or the ATM and debit cards issued by the bank for the account. Over the years since 2004, she was charged numerous overdraft fees on the account.

---

[1] Rec. Doc. 5.

[2] The account was opened as a joint account by Umeki Danielle Jackson and/or Rogernick D. Harding. [Rec. Doc. 4-2, Ex. A-1] The Court presumes the two have since married. Rogernick D. Harding is not a party to this litigation.

On June 8, 2012, Umeki Harding filed this action seeking monetary damages, restitution, and injunctive/declaratory relief from Midsouth Bank NA arising from the bank's alleged unfair, deceptive and unconscionable assessment and collection of overdraft fees. [Rec. Doc. 1] Plaintiff alleges, among other things, that Midsouth would not decline debit card transactions when its customers had insufficient funds, but would instead process the transaction and then charge an overdraft fee, which was often more than the transaction amount, and the bank acted to maximize its profits by reordering electronic debit transactions-processing debits before credits-to deplete available funds and increase overdraft exposure. [Rec. Doc. 1, Para. 4-5]. Plaintiff alleges the defendant bank's practices disproportionately affect low-income customers who maintain low balances. [Rec. Doc. 1, Para. 7]. Plaintiff sues on her own behalf and for all similarly-situated individuals. [Rec. Doc.1, Para. 8,15]. The claims are based on provisions of the Electronic Funds Transfer Act at 15 U.S.C. §1693 *et seq,* and the Class Action Fairness Act at 28 U.S.C. §1332(d), with Plaintiff asserting that the court has jurisdiction over this action, because "there is the requisite diversity of citizenship between members of the purported class and defendant and because the aggregate amount in controversy exceeds $5 million." [Rec. Doc. 1, Para. 13]   The proposed class is described by Plaintiff to include

> all MidSouth customers who, within the applicable statute of limitations through the date of class certification, initiated an electronic funds transfer with an ATM or debit card issued by MidSouth and were assessed one or more overdraft fees or charges for an ATM or one-time debit card transaction as a result of Midsouth's improper practices as alleged herein.[Rec. Doc. 1, Para. 16]

She alleges the class includes thousands of customers in Louisiana and Texas. [Rec. Doc. 1, Para. 19] She urges that the Court should determine Defendant's liability for all Class members in a single action, and that her claims and those of each Class member are based on the same legal theories and

2

arise from the same unlawful conduct. [Rec. Doc. 1, Para. 22-23]

On August 15, 2012, Defendant filed the instant Motion to Compel Arbitration and Stay Proceedings[Rec. Doc. 4], urging that Plaintiff executed an Account Agreement and Deposit Agreement with Midsouth Bank at the time she opened her checking account in December, 2004. The agreement, acknowledged by the plaintiff's signature, contains an arbitration provision under the bolded heading "**Arbitration and Judicial Reference**," which states in pertinent part:

> Upon request by you or us, any controversy or claim involving more than $25,000 that arises out of, or relates to, this agreement, or your deposit relationship with us, shall be settled by arbitration in accordance with Title 9 of the United States Code(Federal Arbitration Act) and the Commercial Arbitration Rules of the American Arbitration Association....
> BY ENTERING INTO THIS AGREEMENT, YOU AND WE WAIVE OUR RIGHT TO TRIAL BY JURY.... [Agreement, Rec. Doc. 4-2, p. 13]

Defendant argues that the arbitration provision, made part of the Agreement signed by the plaintiff, applies to the claims made in this litigation, since the plaintiff has alleged that Midsouth violated/breached the Account Agreement and has placed in controversy more than $25,000 in actual and statutory damages; as representative of a proposed class, she has alleged an amount in controversy which exceeds $5 million. [Rec. Doc. 1, Para. 13] On that basis, Defendant seeks an order from the court compelling arbitration and a stay of the instant proceedings pending exhaustion of the arbitration process.

In opposition to the motion, Plaintiff argues that her claims do not meet the financial threshold for triggering the arbitration provision. She further urges that the provision itself is part of an unenforceable adhesion contract. Finally, Plaintiff asserts that the parties should be permitted to conduct limited arbitration-related discovery on the issues presented, in advance of a ruling by the

court. [Rec. Doc. 9]

***Applicable Legal Standards:***

Arbitration is a matter of contract. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). As such, a party will not be required to submit a dispute to arbitration unless the party has agreed to do so. *Id*. Accordingly, when deciding a motion to compel arbitration, courts are to conduct a two-step inquiry—the first step of which is to determine whether the parties agreed to arbitrate the dispute in question. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985); *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir.1996). This "first step" involves two considerations: (a) whether there is a valid agreement to arbitrate between the parties; and (b) whether the dispute in question falls within the scope of that agreement. *Webb*, 89 F.3d at 258. When deciding whether the parties have agreed to arbitrate the dispute in question, courts generally apply ordinary state-law principals governing contract formation. *Id*. State law must be applied, however, with due regard to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration. *Id*. The second step of the two-step inquiry is to determine whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims. *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S.Ct. at 3355; *Webb*, 89 F.3d at 258..

The Federal Arbitration Act (FAA) applies to contracts involving interstate commerce that contain or are subject to a written agreement to arbitrate. 9 U.S.C. §§ 1–2. The statute provides for "the enforcement of arbitration agreements within the full reach of the Commerce Clause", and reaches more transactions than those actually "within the flow of interstate commerce". *Citizens

*Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) (internal quotation marks omitted). The Agreement at issue in this matter specifically references the FAA as the intended standard for dispute resolution between/among the parties.

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1, et seq., creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 103 S.Ct. 927, 941 (1983). When deciding whether parties should be compelled to arbitrate, courts conduct a two-step inquiry. *Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211, 214 (5th Cir.2003). First, the court must decide whether the parties agreed to arbitrate their dispute and, if so, whether this dispute falls within the scope of the arbitration agreement. *Id*. Second, the court must consider whether any federal statute or policy renders the claims nonarbitrable. *Id.*

### *Is there a valid agreement to arbitrate?*

Plaintiff argues that the arbitration clause at issue is an unconscionable adhesion contract. She urges that the clause "is contained within a lengthy document and is provided to customers when they open their accounts on a take-it-or-leave-it basis." [Rec. Doc. 9, p. 7 of 19] She argues that the clause is "written in legalese" and is "buried deep" within the Agreement, and is "barely distinguishable from the remainder of the Deposit Agreement." This Court disagrees. The clause at issue is easy to find within the Agreement document, below a bolded heading. It includes lines which are capitalized for emphasis, and its language appears clear enough to be reasonably understood by a reader. Plaintiff has not claimed she did not see the agreement; she has not denied that her signature appears on bank documents submitted into the record. Moreover, the history of the plaintiff's relationship with the defendant bank over years and through multiple admitted

applications of the bank's overdraft procedures warrants the inference that Plaintiff, who could have ended the relationship at any time, chose to continue the 'agreement' in place. On these facts, and making the appropriate case-by-case consideration[3], the undersigned finds no support for the argument that the agreement set out in the arbitration clause is not a valid agreement.

*Does this dispute fall within the scope of the arbitration agreement?*

The real issue between the parties, as presented at the recent oral argument, is whether the dispute before the Court falls within the scope of the arbitration clause, with the plaintiff arguing that her individual claim does not meet or exceed the $25,000 threshold factor set out in the clause. In considering the question, this Court examines whether the specific dispute at issue falls within the scope of the arbitration provision. That "inquiry is not guided by the legal labels attached to the plaintiff's claims; rather it is guided by the factual allegations underlying those claims." *Harvey v. Joyce*, 199 F.3d 790, 795(5th Cir. 2000).

Determining whether a dispute falls within the scope of an arbitration clause requires the court to characterize the arbitration clauses as "broad" or "narrow." *Pennzoil Exploration & Production Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir.1998). "Broad arbitration clauses ... embrace all disputes between the parties having a significant relationship to the contract, regardless of the label attached to the dispute." *Id*. Narrow arbitration clauses require arbitration only of disputes "arising out of" the contract, while broad clauses are those that cover all disputes that "relate to" or "are connected with" the contract. *Id*. *See also Prima Paint*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1802-03, 18 L.Ed.2d 1270 (1967) (labeling as "broad" a clause requiring arbitration of

---

[3] See *Green Tree Financial Corp.-Alabama, v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000).

"[a]ny controversy or claim arising out of or relating to this Agreement").

The arbitration clause at issue in this case applies to "any controversy or claim" that "arises out of, or relates to, this agreement, or your deposit relationship with us." Such language, especially when linked by the disjunctive 'or,' demonstrates the intent to expand the scope of application of the clause and is consistent with arbitration clauses interpreted to be 'broad' by the courts of this Circuit. In this case, however, the clause includes additional language which sets a monetary value threshold for application of the arbitration clause. Therein lies the dispute between the parties. Defendants urge that the amount placed in controversy by the plaintiff on the face of the pleadings exceeds the threshold of $25,000, as set out in the clause, especially when considered in the context of the plaintiff's declaration that the class claims she seeks to present are valued in excess of $5 million. The plaintiff seeks to confine consideration of the 'amount in controversy' to her individual claims, which she declares fall far short of the threshold referenced in the arbitration clause, a provision which the plaintiff argues is "exceedingly narrow."

Should the class action damage claims advanced by the plaintiff be considered in determining the 'amount in controversy' question? According to the allegations in the Complaint, the class action claims sought to be presented by the plaintiff are based upon the alleged similar circumstances of the class members as account holders with Midsouth Bank, bound by similar bank procedures and practices, including the agreement at issue. On those allegations, it can be reasonably inferred that the claims of all class members will involve application of Midsouth's Agreement. That forms the basis of the plaintiff's representative claims. Considered in that way, there is no question that the 'controversy' arising out of, or relating to the Midsouth Agreement is purported to be shared by all similarly-situated claimants, represented herein by the plaintiff, based on her own relationship with

the bank. That 'controversy' is declared by the plaintiff to exceed $5 million. In the plaintiff's effort to limit the application of the arbitration clause to her individual claims, she offers no legal authority for that conclusion, and this Court finds no legal basis for disregarding the class action claims sought to be advanced by this plaintiff.

The question of arbitrability is determined on the basis of the existence of an arbitration clause that on its face appears broad enough to encompass the parties' claims. *Commerce Park at DFW Freeport v. Mardian Construction Co.*, 729 F.2d 334, 338 (5th Cir.1984). A presumption of arbitrability exists requiring that whenever the scope of an arbitration clause is fairly debatable or reasonably in doubt, the court should decide the question of construction in favor of arbitration. *United Steelworkers of America v. Warrior & Gulf Navigational Co.*, 363 U.S. 574, 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). The presumption favoring arbitrability is based in large part on policy considerations. A primary consideration recognized by the courts has been the desirability of relative speed and economy of arbitration "not subject to delay and obstruction in the courts." *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967). A second consideration which has influenced courts to embrace the resolution of disputes by arbitration is the desirability of "eas[ing] the congestion of the Court dockets." *Southwest Industrial Import and Export, Inc. v. Wilmod Co., Inc.*, 524 F.2d 468, 470 (5th Cir.1975). Furtherance of these objectives requires broad construction of arbitration agreements. *Mar-Len of Louisiana, Inc. v. Parsons-Gilbane* 773 F.2d 633, 635 -636 (C.A.5 (La.)1985). "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration ... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Hospital v. Mercury*

*Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). See also *Rojas v. TK Communications, Inc.*, 87 F.3d 745, 747 (5th Cir.1996) (whenever the scope of an arbitration clause is in question, the court should construe the clause in favor of arbitration). Even if, however, the Court was to acknowledge that the arbitration provisions at issue were ambiguous, "to acknowledge the ambiguity is to resolve the issue, because all ambiguities must be resolved in favor of arbitrability."*Armijo v. Prudential Insurance Co. of America* at 798. *Mouton v. Metropolitan Life Ins. Co.*, 147 F.3d 453(5th Cir. 1998).

Arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that could cover the dispute at issue." *Wick v. Atlantic Marine, Inc.*, 605 F.2d 166, 168 (5th Cir.1979). On review of the facts, the allegations of the pleadings and the arguments of the parties, the undersigned cannot make that statement with the requisite positive assurance.

Finally, the court must consider whether any federal statute or policy renders the claims nonarbitrable. Plaintiff has not presented, and the undersigned has not found any binding legal authority which would require excluding the representative class claims from consideration as "a controversy,"and on application of the presumption of arbitrability, this Court concludes that the dispute at issue falls within the scope of the arbitration agreement.

### *Conclusion*

Based on the foregoing, the undersigned finds no support for Plaintiff's assertion that the agreement set out in the arbitration clause is not a valid agreement and concludes that there was a valid agreement to arbitrate. On application of the appropriate legal standards discussed at length above, construing the arbitration clause in favor of arbitrability, the undersigned cannot state "with

positive assurance" that the clause at issue is not susceptible of an interpretation that could cover the dispute between the parties herein. On that basis, the court concludes that the dispute at issue falls within the scope of the arbitration agreement, and the defense motions to compel arbitration and to stay proceedings should be GRANTED.

Signed this 3rd day of October, 2012 at Lafayette, Louisiana.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE